2024R00104/MHS

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. |
| | : | |
| TEFYLON CAMERON | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 371 |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States for the District of New Jersey charges:

## COUNT ONE
(Conspiracy to Commit Health Care Fraud)

1.      Unless otherwise indicated, at all times relevant to this Information:

### Relevant Individuals and Entities

a.      TEFYLON CAMERON ("CAMERON") was a resident of Georgia who owned, operated, and/or had a financial or controlling interest in multiple Georgia-based durable medical equipment ("DME") companies, including CAMERON DME Company 1, CAMERON DME Company 2, CAMERON DME Company 3, and CAMERON DME Company 4 (collectively, the "CAMERON DME Companies"), and in a Georgia-based cancer genetic test ("CGx Test") marketing supply company, including CAMERON CGx Company 1.

b.      The CAMERON DME Companies were enrolled with Medicare as suppliers of DME, and therefore were authorized to bill Medicare for the supplying of orthotic braces.  Pursuant to those requirements, the CAMERON DME Companies were also responsible for acknowledging that any claims made to Medicare complied

with the relevant laws, regulations, and program instructions. CAMERON used the names of others to conceal her ownership of some of the CAMERON DME Companies.

c.     CAMERON and her coconspirators used companies (the "DME Supply Companies") that generated information and documents amounting to a guarantee that Medicare would reimburse the purchase of DME, referred to herein as a completed doctor's order ("DO"). As that term was used during CAMERON's scheme, a DO was comprised of a prospective beneficiary's name, contact information, insurance information, and a doctor's order or prescription for a DME orthotic brace, such as a knee, ankle, back, wrist, or shoulder brace for that particular beneficiary.

d.     Coconspirators Aaron Williamsky ("Williamsky") and Nadia Levit ("Levit"), who are not charged in this Information, were residents of New Jersey who owned, operated, and/or had a financial or controlling interest in several DME companies (the "Williamsky/Levit DME Companies"), which primarily supplied DME to Medicare beneficiaries. The Williamsky/Levit DME Companies were enrolled with Medicare as suppliers of DME and were authorized to bill Medicare for the supplying of orthotic braces. Pursuant to those requirements, the Williamsky/Levit DME Companies were also responsible for acknowledging that any claims made to Medicare complied with the relevant laws, regulations, and program instructions.

e.     Coconspirator Jordan Bunnell ("Bunnell"), who is not charged in this Information, was an owner of a clinical laboratory ("Laboratory 1") in Florida and

companies that conducted or arranged for a variety of medical tests ("Testing Companies").

   f. As described more fully below, CAMERON entered into arrangements with Williamsky, Levit, and others whereby the CAMERON DME Companies paid kickbacks and bribes to others, including the DME Supply Companies, in connection with beneficiaries for which the CAMERON DME Companies would then bill to, and be reimbursed by, Medicare and other health care benefit programs, without regard for medical necessity.

   g. As described more fully below, CAMERON entered into arrangements with Bunnell and others whereby CAMERON solicited and received kickbacks and bribes in exchange for beneficiary information related to CGx Tests, which Laboratory 1 would then bill to, and be reimbursed by, Medicare and other health care benefit programs, without regard for medical necessity.

### Background on the Medicare Program

   h. Medicare was a federally funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who receive benefits under Medicare were referred to as "Medicare beneficiaries."

   i. Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

j.      Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

k.      Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

### Durable Medical Equipment

l.      Medicare Part B covered non-institutional care that included physician services and supplies, such as DME that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

### Cancer Genetic Tests

m.      Medicare Part B covered non-institutional care that included, among other things, medical testing such as genetic cancer screenings by clinical laboratories, where those services were reasonable and necessary to diagnose or treat medical conditions and met accepted standards of medical practice.

n.      A CGx Test was a diagnostic tool that tested for a genetic predisposition to cancer.  Medicare reimbursed health care providers approximately $7,700 for each qualifying CGx Test. Generally, a qualifying individual would complete a buccal swab to collect a specimen, which would then be transmitted to a laboratory to conduct a CGx Test.

o.      Under Medicare regulations, any diagnostic laboratory test had to be ordered by the physician treating the Medicare beneficiary; that is, the physician who furnished a consultation or treated a beneficiary for a specific medical

problem and who used the results in the management of the beneficiary's specific medical problem.  Moreover, any tests not ordered by the treating physician were not considered reasonable and necessary and were thus not covered by Medicare.

### Medicare Provider Enrollment

p.     In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

q.     As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with applicable Medicare laws, regulations and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

r.     Medicare-authorized suppliers of health care services, such as clinical laboratories or DME companies, could only submit claims to Medicare for

reasonable and medically necessary services.  Medicare would not reimburse claims for services that it knew were procured through kickbacks or bribes.  Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and program instructions, and violated federal criminal law.

## TRICARE

s.     TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors.  The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

t.     TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

## CHAMPVA

u.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the Department of Veterans Affairs ("VA").  CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries.  The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

v.     In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary.  CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover.  Health care claims had to have first been sent to Medicare for processing.  Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them.

w.     CHAMPVA was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

### Telemedicine

x.     Telemedicine allows health care providers to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient.

y.     Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met.  These requirements included, among others, that: (a) the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed provider's office

or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

z.      Telehealth services could be covered by, and were reimbursable under, Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

### The Conspiracy

2.      From at least in or around January 2017 through in or around July 2020, in the District of New Jersey, and elsewhere, the defendant,

**TEFYLON CAMERON,**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

3.      The goal of the conspiracy was for CAMERON and others to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent

claims for DME and CGx Tests to Medicare and other federal and private health care benefit programs.

## **Manner and Means**

4.    The manner and means by which CAMERON and others sought to accomplish the object of the conspiracy included, among other things, the following:

a.    With respect to DME, CAMERON and others used the CAMERON DME Companies to arrange for shipping orthotic braces to Medicare beneficiaries, and the CAMERON DME Companies electronically submitted or caused the electronic submission of claims to Medicare from New Jersey and elsewhere for payment for each of the qualifying DME orders.

b.    In general, DME Supply Companies obtained DOs for DME for beneficiaries located in the United States and elsewhere through the use of marketing call centers and/or telemedicine companies with whom DME Supply Companies had relationships.

c.    Once the CAMERON DME Companies received the DOs from DME Supply Companies or elsewhere, CAMERON and others arranged for the shipping of the ordered orthotic brace(s) to the beneficiary and electronically submitted and/or caused the electronic submission of a claim to Medicare and/or other federal and private health care benefit programs for payment.

d.    Based on the submission of these claims, the CAMERON DME Companies received from Medicare and other federal and private health care benefit programs payments that they were not entitled to receive.

9

e.     In or around April 2018 and July 2018, money was transferred from a bank account associated with CAMERON DME Company 4 to a bank account associated with DME Supply Company 1, a Florida-based company that provided CAMERON DME Company 4 with DOs for orthotic braces, and to a bank account associated with DME Supply Company 2, a Florida-based company that provided CAMERON DME Company 1 with DOs for orthotic braces.

f.     On or about April 3, 2019, CAMERON signed an approximately $4,462.00 check from an account associated with CAMERON DME Company 1 to a company that performed billing for CAMERON DME Company 1.

g.     In or around September 2019, money was transferred from a bank account associated with CAMERON DME Company 1 to a bank account registered to CAMERON.

h.     With respect to CGx Tests, CAMERON, Bunnell, and others agreed that CAMERON and others would provide Laboratory 1 with leads of beneficiaries who were qualified to receive federal health care benefits.  Those leads included information about individuals whose CGx Tests were eligible for Medicare reimbursement but were provided to Laboratory 1 regardless of medical necessity.

i.     Laboratory 1 generally used telemedicine doctors with whom it had a relationship to furnish a DO and paid the telemedicine doctor on a per-order basis.  The telemedicine doctors generally did not treat beneficiaries for a specific medical problem or use the CGx Test results in the management of the beneficiary's specific medical problem.  CAMERON and others used CAMERON CGx Company 1 to cause CGx Test kits to be sent to the beneficiaries regardless of whether

10

beneficiaries needed or wanted them. After the CGx Tests were performed, Laboratory 1 electronically submitted or caused the electronic submission of claims to Medicare for reimbursement for the tests.

j.      CAMERON submitted invoices to Laboratory 1 for each qualified beneficiary lead that resulted in a Medicare reimbursement, regardless of medical necessity, and received payments from Laboratory 1 for qualified beneficiary leads.

k.      To conceal the payment of kickbacks, CAMERON CGx Company 1 entered into a sham agreement with Laboratory 1 to disguise kickback and bribe payments. Under the sham agreement, CAMERON CGx Company 1 was to submit to Laboratory 1 invoices that reflected, among other things, CAMERON CGx Company 1's total expenses and total number of hours worked. In reality, CAMERON submitted invoices that requested payments on a per-beneficiary basis and received such payments.

l.      Cameron submitted and/or caused the submission of false and fraudulent claims to Medicare and other federal and private health care benefit programs for DME and CGx Tests that were: (1) not medically necessary; (2) never requested by a Medicare beneficiary; (3) never received by a Medicare beneficiary; and/or (4) provided based on a physician order procured through the payment of kickbacks and bribes.

In violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Conspiracy to Violate the Federal Anti-Kickback Statute)

5.    The allegations in Paragraphs 1, 3, and 4 of this Information are hereby incorporated and re-alleged as if set forth fully here.

6.    From at least in or around January 2017 through in or around July 2020, in the District of New Jersey, and elsewhere, the defendant,

**TEFYLON CAMERON,**

did knowingly and intentionally conspire and agree with others to commit offenses against the United States to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, for which payment may be made in whole and in part under a Federal health care program, as defined in Title 42, United States Code, Section 1320a-7b(f), namely, Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## Goal of the Conspiracy

7.    The goal of the conspiracy was for CAMERON and others to unlawfully enrich themselves by soliciting and receiving kickbacks and bribes related to their submission and causing the submission of false and fraudulent claims for DME and CGx Tests to Medicare and other federal and private health care benefit programs.

12

## Overt Acts

8.    In furtherance of the conspiracy, and in order to effect the object thereof, CAMERON and others committed and caused the commission of the following overt acts in the District of New Jersey and elsewhere:

a.    On or about December 6, 2018, CAMERON sent a text message to Levit, who was based in the District of New Jersey, about receiving another attorney general complaint and forwarding the same to Levit.

b.    On or about March 22, 2019, Bunnell caused the transfer of $2,400 to CAMERON, through the District of New Jersey, in exchange for beneficiary leads for CGx Tests.

c.    On or about March 29, 2019, Bunnell caused the transfer of $6,000 to CAMERON, through the District of New Jersey, in exchange for beneficiary leads for CGx Tests.

d.    On or about April 5, 2019, Bunnell caused the transfer of $8,400 to CAMERON, through the District of New Jersey, in exchange for beneficiary leads for CGx Tests.

e.    On or about September 10, 2019, CAMERON received $32,000, which was transferred from a bank account associated with CAMERON DME Company 1 to a bank account registered to CAMERON, through the District of New Jersey.  The payment was sent to the bank account in exchange for beneficiary leads for CGx tests.

f.    On or about September 18, 2019, CAMERON received $283,477.33, which was transferred from a bank account associated with CAMERON

DME Company 1 to a bank account registered to CAMERON, through the District of New Jersey.  The payment was sent to the bank account in exchange for beneficiary leads for CGx tests.

g.      On or about February 7, 2020, CAMERON issued an invoice to Bunnell for $4,800, which reflected payment for beneficiary leads, and on or about February 10, 2020, Bunnell caused the transfer of that amount to CAMERON in exchange for beneficiary leads for CGx Tests.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

1.     Upon conviction of one or both of the offenses alleged in Counts One and Two of this Information, the defendant, TEFYLON CAMERON, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, the defendant obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of each such offense, and all property traceable to such property.

## SUBSTITUTE ASSETS PROVISION

2.     If any of the property described above, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.



VIKAS KHANNA
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

CASE NUMBER: _____

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

### v.

## TEFYLON CAMERON

# INFORMATION FOR

**18 U.S.C. § 1349**
**18 U.S.C. § 371**

VIKAS KHANNA
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED BY
28 U.S.C. § 515

MATTHEW SPECHT
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 353-6061